IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

ANNETTE KEATON WILLIAMS,

    Plaintiff,

vs.                                                                   1:14-cv-50-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

    Defendant.

_____/

## REPORT AND RECOMMENDATION

    Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's applications for disability insurance benefits and supplemental security income benefits. Doc. 1. The Commissioner has answered, Doc. 9, and both parties have filed briefs outlining their respective positions. Docs. 13, 15. Upon due consideration, and for the reasons discussed below, the undersigned recommends that the Commissioner's decision be affirmed.

### I. PROCEDURAL HISTORY

    Plaintiff applied for disability insurance benefits (DIB) and supplemental security income (SSI), alleging disability since April 18, 2008. (R. 68-71, 188-200.) Her applications were denied initially, and upon reconsideration. (R. 72-84, 99.)

    After two hearings by an administrative law judge ("ALJ"), Plaintiff's applications were denied with an unfavorable decision dated March 25, 2013. (R. 24-35.) The Appeals Council denied Plaintiff's request for review. (R. 1-3.) This action followed.

Plaintiff previously applied for, and was denied, DIB and SSI. She appealed the denial to this Court, arguing that the ALJ erred by not considering her psychotic disorder severe at step two, and erred by failing to consider her impairments in combination. *Williams v. Astrue*, Case No. 1:09-cv-27-MP-AK (N.D. Fla. Feb. 10, 2009). In that case, the ALJ discounted Dr. Linda Abeles' diagnoses of psychotic disorder because Dr. Abeles' opinion was unsupported by clinical testing. In the present case Plaintiff again relies on Dr. Abeles' 2007 medical report. This Court affirmed the Commissioner's decision. *Id.,* Doc. 20. Plaintiff appealed, and the decision was affirmed by the Eleventh Circuit. *Id.*, Doc. 40.

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord, Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

‍‍‍‍
‍

the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making a claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[7]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[8] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform

---

[3] *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] *Keeton v. Dep't Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505(a) (2012) (All further references to 20 C.F.R. will be to the 2012 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] *Walker v. Bowen,* 826 F.2d 996, 1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001).

currently exists in the national economy.[9] The Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[10]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[11] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[12]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[13] Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive

---

[9] *Doughty*, 245 F.3d at 1278 n.2. In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[10] *Walker*, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[11] *Wolfe v. Chater*, 86 F.3d 1072, 1077 ( 11th Cir. 1996). *See Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999); *Walker*, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[12] *Walker*, 826 F.2d at 1003.

[13] *Wolfe*, 86 F.3d at 1077-78.

means of introducing such evidence.[14] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

Age is a vocational factor considered by the Commissioner in determining if a claimant is disabled.[15] The rules and Grids take into consideration that advancing age increasingly limits a persons ability to adjust to other work.[16] Therefore, as a claimant ages, the likelihood of being found disabled increases.[17] The Commissioner, however, may not apply the age categories mechanically in a borderline situation, and may apply an older age category if the claimant is a few weeks or months away from an older age category.[18]

## III. SUMMARY OF THE RECORD

### A. Hearing Testimony

Plaintiff's first hearing was held on July 18, 2012. Plaintiff refused to cooperate with the ALJ, and responded to the ALJ's questions by stating that she pled the "Fifth." As a result, the hearing had to be continued. (R. 58-64.)

Plaintiff second hearing commenced on March 5, 2013. Plaintiff's attorney appeared at the hearing, but Plaintiff did not. Plaintiff's counsel explained that after the last hearing, she was referred for a consultative examination. During the consultative

---

[14] *See id.*

[15] 20 C.F.R. § 424.1563(a).

[16] See 20 C.F.R. Pt. 404, subp. P, Appx .2.

[17] 20 C.F.R. § 424.1563(a).

[18] 20 C.F.R. § 424.1563(b).

examination the Plaintiff behaved erratically and stormed out of the office. As a result counsel believed that Plaintiff would not be present at that hearing.

Accordingly, the ALJ waived Plaintiff's rights and questioned the Vocational Expert (VE).  The VE testified that Plaintiff had past relevant work as a dishwasher, food service worker, office cleaner, and inserter.

The ALJ asked the VE to assume a person of the same age, education, and work background as Plaintiff, with the ability to work the full range of light work, except no ladder or scaffold climbing, and only occasional postural motions, including occasional overhead reaching with the left upper extremity, and only frequent upper extremity fingering and feeling.  The individual also was limited to avoid work hazards such as unprotected heights and exposure to machinery.  The individual was also limited to routine, uninvolved types of work, not requiring detailed decision making and not requiring a production rate pace.

The VE testified that such an individual could perform Plaintiff's past relevant work as a food service worker, and inserter.  The VE also identified other jobs in the national economy that Plaintiff could perform including housekeeper, office helper, and cleaner of vehicles.

The ALJ asked the VE if no more than occasional required work interaction with coworkers, supervisors, and the public was added whether that would change the result.  The VE testified that such a person would be able to perform her past relevant work of inserter, and could also perform the other jobs of cleaner of vehicles, office helper, and housekeeper.

Plaintiff's attorney asked the VE whether a person would be able to perform any work if the hypothetical person was as described above and the person also randomly interacted inappropriately with others and used unacceptable behavior or language, reacted inappropriately to criticism by leaving or using profanity, and distracted other workers. The VE testified that such a person would be unemployable. Plaintiff's attorney also asked whether a person with the same limitations used in the ALJ's hypothetical and who used swear words on the job would be able to maintain employment. The VE testified that a person who would not be able to control their mannerisms and behavior would not be employable. (R. 45-55.)

**B. Medical Record Evidence**

Because Plaintiff's appeal focuses on her mental impairments, the Court's summary will focus on those records, after the alleged disability onset date.[19]

Plaintiff discussed her disability application treated with Dr. Ken Grauer during her visits on June 8, 2009, and again on January 13, 2010. Although Dr. Grauer said that Plaintiff was disabled due to her mental health problems, Dr. Grauer did not believe it beneficial to force Plaintiff to see a psychiatrist given her reluctance. (R. 519-21; 529.)

Plaintiff reported to the Emergency Department at Shands on May 2, 2010, complaining of a sweet taste in her mouth for the previous five days. She wanted testing to determine if she was being poisoned because she thought her neighbors did not like her. Plaintiff explained that she did not call the police about her suspicions

---

[19] Records from before the onset date are not addressed because they pertain to a previously adjudicated disability application, and were similarly omitted from the ALJ's opinion. (R. 30.)

because she was previously arrested for "praising the name of Jesus in the presence of a judge." Plaintiff explained that she refused psychiatric drugs because her only medicine was God. The health professionals at the psychiatry department concluded that Plaintiff was not a harm to herself or others, and recommended that Plaintiff be discharged from the hospital with instructions to follow up with her primary care doctor. (R. 466-80.) Plaintiff returned to the Emergency Department two days later with the same complaints. The records reflect that Plaintiff did not meet the criteria for the Baker Act because she was not dangerous to herself or others. (R. 481-83.)

Plaintiff followed up with her primary care providers after her discharge, but could not secure psychiatry or counseling because of her lack of funds. (R. 507-08.) During this time, Plaintiff's blood pressure was also checked, and medication was prescribed, but her treating doctor noted that she had a history of non-compliance with medication. Plaintiff's doctor noted that while she was not making the best health care choices, she was making them with fully informed consent. (R. 511.) In November of 2010, Plaintiff treated with her primary care doctors and reported depression and anxiety issues because her house was in foreclosure and her daughter moved in with her child. Despite these stressors, Plaintiff was not interested in medication. (R. 498.)

Plaintiff reported to the Helping Hands Clinic on March 17, 2011 for an intake evaluation. She reported anxiety in social situations, and fear of what others think of her. She had a passive death wish and insomnia. Plaintiff refused any medication, and was told to return to the clinic if she needed. Plaintiff also reported that she had been denied disability, and was seeking to reapply. (R. 486-87.)

Plaintiff treated with University of Florida Physicians on March 18, 2011. During this visit Plaintiff sought another psychological evaluation and reported that she had been denied disability.  Plaintiff was advised to call Meridian Behavioral Healthcare, and was provided with written instructions to ensure she would not be turned down.  (R. 495-97.)

Plaintiff was seen for a psychiatric evaluation at Meridian Behavioral on April 18, 2011.  Plaintiff reported that she could not sleep at night, had mood swings, and experienced paranoia and anxiety in public.  Plaintiff was prescribed Abilifly and exercises to help with her anxiety, and coping mechanisms for her panic attacks.  The examiner noted, however, that Plaintiff was argumentative, and Plaintiff's stated goal was "I want you to tell me what I got so I can get disability."  Plaintiff declined counseling services  (R. 565-74; 635-40.)

On May 13, 2011, during an appointment with Maximillian Shokat, DO, about her left shoulder pain, Plaintiff stated that she did not want any more physical therapy, and was glad that Dr. Shokat filled out her paperwork because she had applied for disability. (R. 604.)

Plaintiff was taken to Meridian Behavioral in July of 2012 under the Baker Act. Plaintiff stated that she was at church "praising the Lord," when the police were called. She believed she was not acting unusually.  EMS stated that they had to give her Haldol and use soft restraints as she was agitated and acted psychotic.  Meridian gave her a provisional diagnosis of mood disorder NOS. (R. 770-8.)

### C. The ALJ's Decision

The ALJ determined that Plaintiff met the insured status requirements through June 30, 2013, and that she had not engaged in substantial gainful activity since the alleged onset date. The ALJ found that Plaintiff had the severe impairments of: osteoarthritis of the knees, left shoulder arthritis, left medial nerve abnormality, bilateral carpal tunnel syndrome, mood disorder, paranoid personality disorder, and borderline intellectual functioning, none of which met or equals the Listings.

The ALJ found that Plaintiff had the RFC to perform the full range of light work, except that she was precluded from climbing ladders, ropes, or scaffolds, and precluded from work which required more than occasional postural motions. She was limited to work that involved only occasional overhead reaching with the left upper extremity, and only frequent, not constant, fingering and feeling tasks. She must avoid hazards such as unprotected heights and moving machinery, and is limited to routine, uncomplicated tasks that do not require detailed decision making, work at a production level pace, more than occasional interactions with coworkers and supervisors, or any contact with the public.

In reaching this conclusion, the ALJ only partially credited Plaintiff's complaints, but discredited them to the extent that they were inconsistent with the RFC.

Relying on testimony from the VE, the ALJ found that Plaintiff was capable of performing her past relevant work as an inserter/tabber. Accordingly, the ALJ determined that Plaintiff was not under a disability through the date of the decision. (R. 24-35.)

## IV. ANALYSIS

Plaintiff describes the sole issue on appeal as: "Whether Because Plaintiff Williams Is So Obviously Severely And Chronically Mentally Ill, ALJ Martin's Decision That Plaintiff Williams Is Not Disabled Is Arbitrary, Capricious And Unsupported By Any Substantial Evidence And Can Not Stand Up To Even The Incredibly Limited Scrutiny This Court Is Able to Afford Social Security Plaintiffs." Doc. 13. Although Plaintiff argues that the ALJ's decision was arbitrary and capricious, the standard of review applied by the Court is whether the Commissioner's findings are supported by substantial evidence. Plaintiff's challenge to the ALJ's evaluation relates only to Plaintiff's mental impairments.

In determining Plaintiff's impairments and formulating the RFC, the ALJ reviewed Plaintiff's medical records in detail, including her mental health records. The ALJ also appropriately considered and discussed Plaintiff's activities of daily living in evaluating Plaintiff's RFC.

The ALJ concluded that Plaintiff could perform routine, uncomplicated tasks that do not require detailed decision-making or work at a production rate pace. The notes from Plaintiff's mental health examinations support this finding. In making this determination the ALJ recognized that Plaintiff had moderate limitations in concentration, persistence or pace. While recognizing these limitations the ALJ relied upon the medical notes from Matthew Nguyen, M.D., who treated Plaintiff at Shands Hospital. Dr. Nguyen found that even without psychotropic medications, Plaintiff's recent and remote memory were intact and Plaintiff's capacity for attention and concentration were adequate. (R. 482.) In addition to Dr. Nguyen's notes, the ALJ

relied upon the notes of Plaintiff's other mental examinations which were largely unremarkable and evidenced that Plaintiff had normal mood, thought content and judgment and that her memory was intact. (R. 475, 495, 498, 503, 505, 507, 544, 588, 590, 594, 601, 623, 651, 684, 689, 723, 772, 778, 797, 805, 812, 843, and 845.) Plaintiff's cognition was also noted as intact (R. 568, 772) and the notes from her mental examinations do not show that Plaintiff had overt signs of depression, mania or hallucinations. (R. 493, 594 and 778.)  The ALJ also pointed to the fact that Plaintiff spent time praying, mediating, reading bible lessons, watching the news and doing puzzles, each of which is an activity that demonstrates Plaintiff was able to concentrate.

The ALJ also concluded that Plaintiff was limited to work that does not require more than occasional interactions with coworkers and supervisors, or any contact with the public. As evidence that Plaintiff could perform work with these limitations the ALJ pointed to the fact that Plaintiff reported she spent time with family members and attended church regularly.

While Plaintiff "acted out" at her first hearing and "stormed out" of a consultative examination, the medical sources who examined Plaintiff, found her to be cooperative and calm (R. 468, 475, 482, 623, 626, and 800) and during these evaluations Plaintiff exhibited normal behavior. (R. 689, 723, and 800.)

In evaluating the functional limitations from Plaintiff's metal impairments the ALJ further relied upon the substantial evidence of record that Plaintiff failed to participate in treatment for her mental disorders, such as ongoing counseling and medication, even though her doctors recommended that she participate in counseling.  And where medications were recommended Plaintiff was non-compliant.

The ALJ also found it was significant that the medical records reflected an "apparent attempt to create a medical record without actually obtaining treatment for some of her impairments." For example, a 2011 progress note from Meridian Behavioral noted that Plaintiff's responses to intake questions and testing was "questionable" and that Plaintiff was preoccupied with getting documentation for disability purposes. (R. 651.) This evidence coupled with Plaintiff's history of being uncooperative with medical personnel, further supported the ALJ's decision to only partially credit Plaintiff's claims as to the intensity and persistence of her impairments in formulating the RFC.

The mental RFC is also fully consistent with the assessments of the State agency non-examining physicians. One of the examining physicians, Wendy Silver, PsyD., concluded that Plaintiff could understand, remember, and follow simple instructions; attend to and complete simple tasks in a routine setting,; understand and follow a schedule; and complete a normal workweek/workday without excessive interruption from psychological symptoms. (R. 548.) With regard to social functioning, Dr. Silver found that Plaintiff was capable of fair social skills, although Plaintiff would have difficulty with critical supervisors, and would do best in an environment with limited social interactions. *Id.* Dr. Silver's findings were affirmed by James Meyers, PsyD., the other state agency non-examining physician. Notably, the limitation in the RFC to work that does not require more than occasional interactions with coworkers and supervisors, or any contact with the public, is consistent with the opinions of the two state agency non-examining physicians.

Plaintiff attempts to point to the opinions of consultative examiner Linda Abeles, Ph.D. and Ken Grauer, M.D., as support for her argument that the evidence shows she is disabled. There are problems with relying upon each of these opinions.

With regard to Dr. Grauer's opinion, as the ALJ pointed out, the opinion did not identify any specific functional limitations but only a legal conclusion reserved for the Commissioner.

Dr. Abeles' disability opinion does not constitute substantial evidence because the opinion is dated September 2007, before Plaintiff's date last insured. More notably, however, this Court and the Eleventh Circuit already addressed and affirmed the Commissioner's decision in the previous Social Security disability proceeding to give little weight to Dr. Abeles' opinion. Thus, there was no reason for the ALJ to revisit Dr. Abeles' opinion, and this Court is precluded from reviewing the ALJ's determination in the earlier case.

When questioning the VE about the availability of jobs for someone with Plaintiff's limitations, the ALJ's hypothetical question to the VE included all of Plaintiff's limitations and her vocational profile. In response to the hypothetical question, the VE responded that Plaintiff was able to perform her past relevant work as an inserter/tabber, and that there were also other jobs in the national economy that Plaintiff could perform. (R. 33-34.)

Accordingly, the ALJ's determination that Plaintiff was not disabled due to her mental impairments was not an arbitrary and capricious application of the rules but rather was supported by the substantial evidence of record. The ALJ's determination that Plaintiff was not disabled is, therefore, due to be affirmed.

## V. CONCLUSION

In light of the foregoing, it is respectfully **RECOMMENDED** that the Commissioner's decision should be **AFFIRMED**.

**IN CHAMBERS** this 18th day of May, 2015.

*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

### NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.